Slip Op. 14- 71

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BORUSAN MANNESMANN<br>BORU SANAYI VE TICARET A. S.,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant,<br>　and<br><br>UNITED STATES STEEL<br>CORPORATION,<br><br>　　　　　Defendant-Intervenor. | Before: Judith M. Barzilay, Senior Judge<br><br>Court No. 13-00001 |

**OPINION**

[Commerce's Final Results are sustained.]

Dated: June 25, 2014

*Morris, Manning & Martin, LLP* (*Julie C. Mendoza, Donald B. Cameron, R. Will Planert, Brady W. Mills, Mary S. Hodgins, Sarah S. Sprinkle*), for Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A.Ş.

*Douglas G. Edelschick*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was *Whitney Rolig*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Skadden, Arps, Slate, Meagher & Flom LLP* (*Jeffrey D. Gerrish, Robert E. Lighthizer, Jamieson L. Greer*), for Defendant-Intervenor United States Steel Corporation.

BARZILAY, Senior Judge:  Before the court is Plaintiff Borusan Mannesmann Boru Sanayi ve Ticaret A. S.'s ("Borusan") motion for judgment on the agency record under USCIT Rule 56.2, challenging Defendant U.S. Department of Commerce's ("Commerce") final results of the antidumping duty annual review covering welded carbon steel pipe and tube from Turkey. *See Circular Welded Carbon Steel Pipes and tubes from Turkey; Final Results of Antidumping Duty Administrative Review; 2010 to 2011*, 77 Fed. Reg. 72,818 (Dept't Commerce Dec. 6, 2012) ("*Final Results*"), as amended by *Circular Welded Carbon Steel Pipes and Tubes from Turkey; Amended Final Results of Antidumping Duty Administrative Review; 2010 to 2011*, 78 Fed. Reg. 286 Dep't Commerce Jan. 3, 2013) ("*Amended Final Results*"); *Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review: Circular Welded Carbon Steel Pipes and Tubes from Turkey – May 1, 2010, through April 30, 2011*, A-489-501 (Nov. 30, 2012), Docket Entry No. 22 (Feb. 15, 2013) ("*Issues and Decision Memorandum*"). Specifically, Borusan challenges Commerce's determination that Borusan engaged in targeted dumping and application of its average-to-transaction comparison methodology. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). For the reasons set forth below, the court sustains Commerce's *Final Results*.

## I. STANDARD OF REVIEW

When reviewing Commerce's antidumping determinations under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or

conclusions for substantial evidence, the court assesses whether the agency action is "reasonable and supported by the record as a whole." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal quotations and citation omitted). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dupont Teijin Films USA v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. BACKGROUND

Borusan is a manufacturer and exporter of circular welded carbon steel pipes and tubes from Turkey. Borusan and other interested parties requested that Commerce conduct an administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes. On June 28, 2011, Commerce initiated an administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Turkey for the period of May 1, 2010, through April 30, 2011, and selected Borusan as one of the mandatory respondents. *See Initiation*

*of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 76 Fed. Reg. 37,781 (Dep't Commerce June 28, 2011).  Before Commerce issued the preliminary determination, one of the petitioners filed an allegation that Borusan engaged in targeted dumping during the period of review.  Commerce, however, deferred conducting a targeted dumping analysis and published its preliminary results. *See Circular Welded Carbon Steel Pipes and Tubes From Turkey: Notice of Preliminary Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 32,508 (Dep't Commerce June 1, 2012).  Commerce assigned Borusan a preliminary weighted average dumping margin of zero using its average-to-average comparison methodology ("A-A"). *See id.* at 32,512.  Commerce then decided to review the petitioner's targeted dumping allegation and published a post-preliminary determination that analyzed the petitioner's targeted dumping allegation.  Commerce applied its *Nails* test and determined that a pattern of export sales prices that differed significantly within the period of review existed.  Additionally, after concluding that a sufficient volume of export sales passed the *Nails* test, Commerce determined that the A-A methodology could not take into account the observed price pattern since it found a meaningful difference between the results of the A-A methodology and the average-to-transaction ("A-T") methodology, thus warranting application of the A-T methodology.  Accordingly, Commerce assigned Borusan a post-preliminary dumping margin of 2.12%. *See Circular Welded Carbon Steel Pipes and Tubes from Turkey 2010 -- 2011 Administrative Review: Post-Preliminary Analysis and Calculation Memorandum*, A-489-501 (Oct. 22, 2012), Docket Entry No. 69 Tab 8 (Feb. 7, 2014).  In the *Final Results*, Commerce concluded that Borusan did engage in targeted dumping, but revised Borusan's rate and assigned a final dumping margin of 6.05%. *See Final Results*, at 72,820.  Commerce revised

the final rate to correct a ministerial error and assigned Borusan an amended final dumping margin of 3.55%. *See Amended Final Results*, at 287.

### III. DISCUSSION

Borusan argues that Commerce violated 19 U.S.C. § 1677f-1(d)(1)(B) by not considering Borusan's explanation for why its sales demonstrated a pattern of targeted dumping. Pl. Br. 18. More specifically, Borusan argues that targeted dumping "connote[s] a purposeful act or behavior" and therefore takes the position that Commerce must consider whether a respondent intended to engage in targeted dumping to satisfy the statute. *Id.* at 20. Borusan, moreover, relies on the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") to advance its argument that the statute contains an implicit requirement that Commerce consider the "motive" behind its pricing practices before applying the targeted dumping remedy. Pl. Reply Br. 5 (citing SAA, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994)). Borusan's argument is not persuasive.

Section 1677f-1(d)(1)(B) provides:

> The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—
>
> > (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> > (ii) the administering authority explains why such differences cannot be taken into account using [the A-A methodology or the T-T methodology].

§ 1677f-1(d)(1)(B). The "'pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time' is what is

referred to as 'targeted dumping.'" *Timken Co. v. United States*, 38 CIT __, __, No. 14-24, Slip Op. at 4 (2014). Targeted dumping, therefore, is a statutorily defined pricing pattern that permits Commerce to apply an alternative comparison methodology in antidumping investigations and reviews. The SAA provides:

> New section 771A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchasers, regions or time periods, *i.e.*, where targeted dumping may be occurring. Before relying on this methodology, however, Commerce must establish and provide an explanation why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison. In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another.

SAA at 843.

Commerce has established a methodology known as the *Nails* test to determine whether a pattern exists for purposes of § 1677f-1(d)(1)(B). *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008); *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008). The *Nails* test involves a two-step analysis:

> In the first stage of the test, the "standard deviation test," requires the Department to determine the share of the alleged target's (whether purchaser, region, or time period) purchases of identical merchandise, by sales value, that are at prices more than one standard deviation below the average price of that identical merchandise to all customers. The standard deviation and the average price are calculated using a POI-wide average price weighted by sales value to the alleged target, and POI-wide average price weighted by sales value to each distinct non-targeted entity of identical merchandise. If the total sales value that

> meets the standard deviation test exceeds 33 percent of the sales value to the alleged target of the identical merchandise, then the pattern requirement is met.
>
> In the second stage, the Department examines all the sales of identical merchandise that pass the standard deviation test and determines the sales value for which the difference between the average price to the alleged target and the lowest non-targeted average price exceeds the average price gap (weighted by sales value) observed in the non-targeted group. If the share of these sales exceeds five percent of the sales value to the alleged target of the identical merchandise, then the significant difference requirement is met and the Department determines that targeted dumping has occurred.

*Memorandum to David Spooner*, titled "*Antidumping Duty Investigations of Certain Steel Nails from the Peoples Republic of China (PRC) and the United Arab Emirates (UAE): Post-Preliminary Determinations on Targeted Dumping*," A-520-802 and A-570-909 (April 21, 2008), at 8.  The Court has sustained the *Nails* test as reasonable. *See Mid Continent Nail Corp. v. United States*, 34 CIT __, 712 F. Supp. 2d 1370 (2010).

The statute is clear.  Contrary to Borusan's claim that targeted dumping connotes purposeful behavior, the language of the statute simply instructs Commerce to consider export sales price (or constructed export sales price) in its targeted dumping analysis. *See* § 1677f-1(d)(1)(B).  It does not require Commerce to undertake an investigation of the various reasons why a pattern of targeted dumping exists within a given time period.  The SAA does not manifest such a requirement either.  It reaffirms the language in the statute but adds very little other than what is already expressed in § 1677f-1(d)(1)(B).  Therefore, Commerce may make a finding of targeted dumping and apply the targeted dumping remedy based on the pricing pattern described in the statute and specifically articulated in the *Nails* test.  The court cannot identify any language in the statute or SAA that might require Commerce to investigate whether a given respondent has a legitimate commercial reason for such a pricing practice.  Doing so would add a

new element to the targeted dumping analysis, requiring Commerce to also consider whether respondents intended to engage in targeted dumping. The Federal Circuit has rejected this type of intervention. *See Viraj Group v. United States*, 476 F.3d 1349, 1357-58 (Fed. Cir. 2007). The court, therefore, cannot read into the statue some sort of "intent" requirement that does not exist. It would impose a "burden on Commerce that is not required or suggested by the statue." *Viraj Group*, 476 F.3d at 1358. Given that Borusan's claim is predicated on Commerce going beyond what is required by the statute, there is no need to review Commerce's factual determination under the substantial evidence framework.

## IV. CONCLUSION

For the foregoing reasons, Commerce's *Final Results* are sustained. Judgment will be entered accordingly.


Dated: June 25, 2014  /s/ Judith M. Barzilay
New York, NY  Judith M. Barzilay, Senior Judge